**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

NASRIN CHOWDHURY,
                 Plaintiff,

v.

NEW YORK MOTOR GROUP LLC,
PLANET MOTOR CARS, INC;
MAMDOH ELTOUBY;
NADA ELTOUBY;
JULIO ESTRADA a/ka/ "John" a/k/a "John Santos"
a/k/a "Jay Santos" a/k/a "John Dos Santos" a/k/a
"John De Santos" a/k/a "John Figueroa" a/k/a "Jay Torres" and
M&T BANK CORPORATION,

                 Defendants.

-------------------------------------------------------------

**14-CV-2981**

**AMENDED COMPLAINT**

**AND JURY DEMAND**

## <u>INTRODUCTION</u>

1.     This is an action for money damages, injunctive relief, and declaratory judgment, brought by an individual consumer seeking redress for unlawful practices relating to a transaction to finance the purchase of an automobile and setting forth Defendants' violations of the The Racketeering Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961, et seq., New York Motor Vehicle Retail Installment Sales Act, Personal Property Law ("MVRISA") § 302, et seq.; New York General Business Law §§ 349 and 350, New York State Usury Law, and setting forth common law claims for Fraud, Breach of Contract, Rescission/Mistake, and Negligent Hiring Retention and Training.

2.     Plaintiff brings suit on an individual basis as part of a series of related cases stemming from the unfair, abusive, fraudulent and criminal practices employed by New York Motor Group and Planet Motor Cars, Inc (collectively "the Dealerships" or "the Dealership") and their owners

1

and employees in their attempt to sell an automobile to and extract payments from Plaintiff beginning on January 28, 2013.

3.      The Dealership's fraudulent scheme depends on the participation of lending institutions such as Defendant M&T Bank Corporation ("M&T") who willingly fund the loans that are assigned by the Dealership, regardless of the fraudulent or criminal measures involved in the creation of the loans.

4.      When consumers, such as Ms. Chowdhury, complain to M&T and other financial institutions about the fraudulent practices of the Dealership, they are told that the financial institution cannot assist them in anyway and that they must continue to pay the full amount demanded by the institution, regardless of any fraud or criminal activity involved in the origination of the loan.

5.      In this way, the fraudulent schemes described in this complaint are conducted for the financial benefit of all Defendants.

6.      During her interactions with the Dealership, Ms. Chowdhury dealt with the finance manager Julio Estrada.

7.      Mr. Estrada has been preying on consumers for several years while working as the finance manager for various auto dealerships in New York.

8.      On December 3, 2012, Mr. Estrada was arrested and indicted by a Queens County Grand Jury on multiple counts of theft, larceny, forgery and fraud related to his alleged actions while working as the finance manager for Auto Palace, Inc.

9.      On December 4, 2012 The Queens County District Attorney announced the indictment in a press release that identified Mr. Estrada as having defrauded over 23 consumers out of more than $115,000 with the promise that they could return to him to refinance their high rate loans

2

after six months of on-time payments and thereby receive better rates and lower their monthly payment by hundreds of dollars.  That case was heard in Queens County Supreme Court-Criminal Term, People v. Julio Estrada, Docket No. 02842-2012.

10.     Mr. Estrada's criminal activity included theft of thousands of dollars in cash from consumers who, relying on his false promise of refinancing, returned to do so, and were further fraudulently induced to turn over more money in order to facilitate a refinancing that never occurred.

11.     Within weeks of that indictment and arrest, Mr. Estrada was working for the Defendant Dealerships to manage their financing procedures in the sale of automobiles.

12.     In December 2013, Mr. Estrada was convicted after pleading guilty to Grand Larceny in the 3rd Degree in the Queens County Criminal case and was sentenced to 5-years' probation and restitution of $118,000.

13.     On information and belief the Dealerships' Principal and Owner, Defendant Mamdoh Eltouby, was aware of or should have been aware of Mr. Estrada's arrest and indictment during all relevant times described herein.

14.     At all relevant times herein, Defendant M&T, on information and belief, was aware or should have been aware of the fraudulent and criminal practices of the Dealership at the time it funder Plaintiff's loan.

15.     On information and belief, several other consumers have contacted M&T Bank and made complaints about the Dealership, its owner, or the finance representative Julio Estrada and other employees or agents of the Dealership, on many occasions in the past 18 months.

16.     Upon information and belief, Mr. Estrada worked closely with Mamdoh Eltouby's daughter, Nada Eltouby, and other employees and agents of the Dealerships, while overseeing

the financing procedures for the dealership during all relevant times herein; and Ms. Eltouby knowingly assisted Mr. Estrada in placing consumers in loan obligations that resulted in thousands of dollars of unfair, deceptive, illegal and fraudulently induced overcharges, obtaining further cash payments from consumers under false pretenses.

17.     Upon information and belief, Mr. Estrada has used several aliases while working for the Dealerships including "John," "Jay," "John Dos Santos," "John De Santos," "Jay Santos," and "John Figueroa."

18.     At all relevant times described in the complaint, Mr. Estrada was known to the Plaintiff only by the alias "John De Santos."

19.     Upon information and belief, the Dealerships' fraudulent scheme has been running since before Mr. Estrada began working for Planet Motor Cars and/or New York Motor Group and have continued without Mr. Estrada's assistance.

20.     The Dealership has preyed on consumers in attempts to unfairly, illegally, and fraudulently increase the costs of transactions to consumers for the benefit of all Defendants and obtain cash payments under the false pretense of refinancing consumers' loans or of paying-off any remaining loan balance.

21.     As will be described in full detail below, this is precisely what occurred to Plaintiff in their dealings with the Dealerships.

## JURISDICTION AND VENUE

22.     Jurisdiction is based on 18 U.S.C. § 1965 and 28 U.S.C. § 1337.

23.     The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201 and § 2202.

24.     This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the events and omissions complained of took place in this District and Defendants maintain offices, transact business, and are otherwise found in this district.

## THE PARTIES

26.     Plaintiff Nasrin Chowdhury is a resident of Queens County, New York.

27.     Defendant NY Motor Group LLC ("NYMG" or "Dealership") is a domestic limited liability company under the laws of New York, whose principal place of business is located in Woodside, New York in Queens County.

28.     Defendant Planet Motor Cars, Inc. ("Planet Motor Cars") is a corporation incorporated under the laws of New York, whose principal place of business is located in Jamaica, New York in Queens County.

29.     Defendant Mamdoh Eltouby is the owner of NYMG and, upon information and belief, is the owner or has an ownership interest in Planet Motor Cars.

30.     Mr. Eltouby's principal place of business is at New York Motor Group in Queens County.

31.     Mr. Eltouby currently determines the policies and procedures of NYMG and Planet Motor Cars and makes decisions to hire, train and retain employees, in particular the finance manager for the Dealerships.

32.     At the time of Plaintiff's transaction, Mamdoh Eltouby was the primary decision maker and the person who managed the day-to-day operations of NYMG and Planet Motor Cars.

5

33.     Mamdoh Eltouby is the primary decision maker and the person who manages the day-to-day operations of NYMG and Planet Motor Cars.

34.     On information and belief, NYMG and Planet Motor Cars are part of the same business venture owned, operated or otherwise controlled by Defendant Mamdoh Eltouby; and each entity will be collectively and interchangeably referred to hereafter as "the Dealership" or "the Dealerships" or "Dealership Defendants."

35.     Defendant Nada Eltouby is Mamdoh Eltouby's daughter and is employed by the Dealership where she assists with the sale and financing of vehicle purchases.

36.     Ms. Eltouby's business address is at Planet Motor Cars.

37.     Julio Estrada is or was an employee of the Dealership whose primary responsibility is management of the Dealership's financing process.

38.     Julio Estrada, at all relevant times herein, was a resident of New Jersey, with a business address at New York Motor Group.

39.     Defendant M&T Bank Corporation is a domestic financial corporation whose principal place of business is located at One M&T Plaza Buffalo, New York 14203.

40.     M&T is the assignee of a Retail Installment Contract between Plaintiff and the Dealership and, therefore as an assignee, is liable for all claims asserted against the Dealership under State and Federal law, as well as being directly liable for all of its own acts of wrongdoing as described herein.

## FACTS

41.     In January 2013, Plaintiff and her son Shehad Kazi traveled to the Dealership location of NYMG at 60-20 Northern Boulevard Woodside, New York, to inquire about a 2009 Nissan Murano she saw advertised on www.cars.com for $16,999.99.

6

42.     At the dealership she was approached by a salesman named "Dewan" who discussed the advertised vehicle.

43.     Ms. Chowdhury offered to pay all cash for the vehicle if the Dealership would sell it for $15,000 .

44.     Dewan explained that the car could not be sold in an all cash deal and that Ms. Chowdhury would have to finance some portion of the purchase.

45.     Ms. Chowdury and Shehad explained that they would only finance the vehicle purchase if the Dealership would sell it for $15,000.

46.     Dewan then went to get the assistance of the owner Mamdoh Eltouby.

47.     Mr. Eltouby spoke with Ms. Chowdhury about the purchase of the vehicle.  When he learned that she was willing to put down $10,000 as a deposit, Mr. Eltouby authorized Dewan to sell the vehicle for $15,000, allowing Ms. Chowdhury to finance the remaining $5,000 due on the vehicle.

48.     Ms. Chowdhury and Shehad then waited as they were led to believe the Dealership was preparing a sales contract.

49.     But after some time, Dewan came back to them and explained that the car advertised on cars.com had already been sold to another consumer.

50.     Dewan further explained that there was a different car available for sale that was also a 2009 Nissan Muran and asked Ms. Chowdhury to return the next day to complete the purchase.

51.     Ms. Chowdhury returned with her husband on January 28, 2014.  But the Dealership informed her that the other car had also been sold already and that they would call her as soon as they had a Nissan Murano available for sale.

52.     That afternoon, the Dealership called Ms. Chowdhury to tell her that they did in fact have a 2009 Nissan Murano for sale and invited to come back in immediately.

53.     Ms. Chowdhury and her husband returned to the Dealership in the evening of January 28, 2013 and saw the 2009 Nissan Murano, VIN # JN8AZ18W09W206703 ("the Vehicle"), that was for sale.

54.     The Dealership employee they spoke with that night apologized for all the inconvenience and advised that the Dealership would sell the Vehicle to them for $13,500 to make up for inconvenience.

55.     Ms. Chowdhury agreed to purchase the Vehicle for $13,500.

56.     She was then required to put down her $10,000 deposit in order to secure the deal.

57.     The Dealership then prepared a sales contract for Ms. Chowdhury which indicated that the selling price was being reduced to $13,500.

58.     Ms. Chowdhury was then advised to return the next day to complete the financing of the remaining $3,500 balance with the finance manager Julio Estrada.

59.     Ms. Chowdhury returned to the Dealership on January 29, 2013 with her son Shehad Kazi.

60.     Ms. Chowdhury and Shehad met with the finance manager Julio Estrada that day, who introduced himself using the alias "John Dos Santos."

61.     Mr. Estrada first confirmed sale price of $13,500 as agreed the night before but explained to Ms. Chowdhury that  in order to finance the Vehicle purchase through M&T Bank she would have to choose from one of two options:

   a)  4.9% interest on the loan principal with the ability to pay off the full balance after 6 Mos.  This option included, according to Mr. Estrada, 6 monthly payments of

259.35 and final 7th payment of $4,000 that was to be paid directly to the dealership.

b)  12% interest on the loan principal with no ability to make an early pay off

62.    As Ms. Chowdhury did not want to be stuck in a 5 year loan at 12% interest, she agreed to the first option.

63.    Mr. Estrada then explained that in order to obtain financing on that lower interest rate, Ms. Chowdhury would also have to purchase a warranty or service contract on the vehicle.

64.    Ms. Chowdhury and Shehad explained that she did not want a service contract, but Mr. Estrada insisted that the contract was required in order to obtain financing from the bank.

65.    He promised, however, that Service Contract could be cancelled in 60 days, and that since they wanted it cancelled it would be confirmed in an email at that time.

66.    Mr. Estrada did not advise Ms. Chowdhury of any specific price for the Service Contract but just advised that it was included in the first option as part of all amounts due under that option.

67.    As she had already been provided a sales contract showing a sale price of $13,500 and knowing that she had made a $10,000 deposit, Ms. Chowdhury and her son believed that under the option chosen, she would be able to make additional payments of $6556.10 over the following 7 months to pay off the loan in-full, thereby purchasing the car for a total of $16,556.10.

68.    As these terms appeared reasonable to her, and the amount required was about the amount of money she had always been hoping to spend on the first Nissan Murano she saw advertised on cars.com, she agreed to the first option Mr. Estrada presented.

69.     Mr. Estrada then presented Ms. Chowdhury with a series of documents, including a retail installment contract carrying the M&T Bank logo ("the M&T RIC" or "RIC").

70.     All of the documents, including the RIC, had pre-printed boxes to include financial and other information.

71.     On all of the documents, including the RIC, these boxes were blank.

72.     When asked, Mr. Estrada explained that the computer would fill in all of the numbers later.

73.     Again, as she already had a sales contract showing a sale price of $13,500,  Ms. Chowdhury felt confident that she had closed a deal to purchase the car at that price with additional costs for interest and the service contract bringing the total up to $16,556.10.

74.     After signing all of the documents put in front of her by Mr. Estrada, Ms. Chowdhury and her son waited while Mr. Estrada had the documents finalized.

75.     When ready, Mr. Estrada folded all documents into a roll, concealing the front side of each one, and handed them in a bunch to Ms. Chowdhury and gave her the keys to the Vehicle.

76.     Ms. Chowdhury and her son Shehad, turned over the RIC and noticed that Mr. Estrada had added amounts to the contract that were far higher than the amounts agreed to.

77.     The M&T RIC, as altered by Mr. Estrada and/or other employees and agents of the dealerships after Plaintiff had signed it, showed a cash price of $24,471.00, with credit for $10,000 down payment, and showed an amount financed of $14,911.99.

78.     The M&T RIC further included a charge for $90.00 related to Vendor's Single Interest Insurance which was described on the RIC as a requirement for financing.

79.     One of the other documents handed to Ms. Chowdhury in the bundle was a Theft Deterrent Product Protection form which did not include a price for the protection.

80.   It did, however, list the Vehicle price as $22,476.23

81.   Ms. Chowdhury was not given any documents related to the service contract Mr. Estrada represented to be required for financing.

82.   Shehad asked Mr. Estrada why the Vehicle price and the financed amount were shown as higher on these documents following the addition of the numbers.  Mr. Estrada advised that they could disregard the financed amount and all other numbers on the M&T RIC and other documents, because, as he promised, their final lump sum payment on the 7th month would pay off the loan in full.

83.   Relying on Mr. Estrada's representations which were supported by a sales contract and other documents that confirmed that the selling price of the Vehicle was $13,500, Ms. Chowdhury and her son, left the dealership with the Vehicle.

84.   Thereafter, Ms. Chowdhury began to receive monthly bills from M&T Bank requiring her to pay $259.35 each month, which she paid.

85.   Relying on the representations of Mr. Estrada, Shehad, on his mother's behalf, began calling to the Dealership in July 2013 to find out when they could come in to make their final payment to pay off the loan.

86.   Although he was put off for several weeks by Mr. Estrada and other Dealership employees, Mr. Estrada finally agreed to meet with Shehad on August 21, 2013.

87.   Prior to the meeting, Estrada advised Shehad that the Dealership would now require a lump sum payment of $4480.81 to pay off the loan in-full, an amount $480.81 higher than first confirmed on January 29, 2013.

88.   Shehad arrived at the Dealership with the money as requested on August 21, 2013 to make the final 7th payment for his mother to pay off the loan in-full.

11

89.     After Shehad paid the $4480.81 in cash, as requested, Mr. Estrada confirmed that the loan was all paid off and that Ms. Chowdhury would be receiving title from the DMV in 30 days.

90.     As further confirmation of this, Mr. Estrada signed a cash receipt which acknowledged payment of $4,480.41.  Next to his signature, Mr. Estrada wrote "8-21-2013  30 Days  9-21-2013."

91.     Mr. Estrada also told Shehad that he or his mother would have to come back to the Dealership the following week to sign a "warranty cancellation form."

92.     Shehad returned to the Dealership several times after that to sign the form, but each time was told by others at the Dealership that Mr. Estrada was not available and he would have to come back.

93.     Finally at some time in September, Shehad met again with Mr. Estrada who did provide him with a document to sign.  It was an "Authorization to Pay Off Loan" form.

94.     Shehad brought it to his mother who signed it on September 10, 2013 and brought it back to the Dealership.

95.     Having relied on Mr. Estrada's representations and the documents confirming payment and other terms of the deal, Ms. Chowdhury did not make loan payments to M&T Bank in August or September 2013.

96.     By letter, dated September 28, 2013, however, M&T contacted Ms. Chowdhury and informed her that she was two-months behind on her loan payments.

97.     Understandably alarmed by this demand for further payments, Ms. Chowdhury asked her son to follow up with M&T and the Dealership to determine what went wrong.

98.     Shehad began calling both M&T and the Dealership immediately.

99.     In a call with Mr. Estrada in or about late September or early October, Mr. Estrada first suggested that Ms. Chowdhury would still have to sign a "warranty cancellation" in order to complete the loan pay-off.

100.    Shehad attempted several times via phone and in-person visits to get that document, but each time was told by Mr. Estrada or others at the Dealership that the form was not available or that Mr. Estrada was not available.

101.    In one call in early October 2013, Shehad spoke on the phone with Nada Eltouby.

102.    During that conversation, Shehad explained to Ms. Eltouby about the agreement that was reached with the Dealership regarding the pay off and the amounts that were paid to the Dealership in August.

103.    Ms. Eltouby assured Shehad that she understood and advised that the Dealership would take care of everything.

104.    After not hearing from Ms. Eltouby for several days, Shehad called back to the Dealership in mid-October and spoke with her again.

105.    He asked for an update on the matter. Ms. Eltouby advised at that time that there was nothing she or the Dealership could do and the Shehad would have to speak to "the Bank."

106.    Shehad, on his mother's behalf, also called M&T and on several occasions in October 2013 spoke to customer service representatives and described all of the events complained of here.

107.    Eventually an M&T representative named "Wendy" called Shehad and advised that she would investigate the matter.

108.    "Wendy" spoke with Shehad on the phone on several occasion in October 2013 and reported that she or others at M&T were attempting to contact the Dealership, but could not reach them and left messages.

109.    During this period in October 2013, Shehad continued communicating with Julio Estrada on the phone and electronically via SMS/cell phone text.

110.    Mr. Estrada expressed a purported concern that M&T had not accepted the pay off, but assured Shehad that if he would be patient the Dealership would take care of things.

111.    In an attempt to placate Shehad and Ms. Chowdhury, Mr. Estrada deposited $558 into Shehad's bank account in order to, as he promised, provide payments from the Dealership to make up for the August and September payments purportedly due M&T Bank, plus late fees.

112.    In a final phone call with "Wendy" from M&T in late October/early November, however, Shehad was advised by M&T that their investigation was complete as they had made several calls and left message but never received calls back from the Dealership.

113.    "Wendy" further advised Shehad that there was a limited amount of things the bank could do.

114.    Acknowledging that the actions of the dealership were illegal, "Wendy" further advised Shehad that Ms. Chowdhury should hire a lawyer to assist her with the situation.

115.    Shehad tried several more times to speak with the Dealership and uncover why the loan had not been paid-off as promised, despite Ms. Chowdhury having complied with all of her obligations under the agreement with the Dealerhsip.

116.    At some point in early November 2013, Mr. Estrada, on behalf of the Dealership and, on information and belief, in retaliation for Shehad's persistence, called Ms. Chowdhury at home

14

and threatened to divulge her personal financial and identifying information to others and to call her at work as well.

117.    Following Mr. Estrada's threatening phone call, Shehad called to the Dealership and spoke with Mr. Estrada who finally agreed to meet with Shehad.

118.    Mr. Estrada told Shehad to bring his cash receipt for the $4,480 payment in August and come to the dealership.

119.    Shehad arrived at the Dealership on or about November 11, 2013.  He spoke with Nada Eltouby and Julio Estrada that day and insisted that they pay-off the loan as agreed.

120.    Mr. Estrada at first refused to provide any assistance.

121.    At some point someone at the Dealership called the Police.

122.    When the police arrived they spoke with Nada Eltouby and Julio Estrada.

123.    The officers asked Mr. Estrada what was happening, Shehad overheard the officers further inquire as to why they were called to respond to so many incidents at the Dealership on a regular basis.

124.    After some conversation with Mr. Estrada, the police officers spoke with Shehad and advised him that the Dealership would give him a refund and further advised him that he should take the money and never return to the Dealership.

125.    Mr. Estrada then requested that Nada Eltouby prepare a money order from the Dealership for $4480.81 and give it to Sheahd.

126.    Mr. Estrada provided the money order to Shehad and finally advised that if he wanted to have the unwanted service contract canceled, Sheahd would have to contact the contract provider, AUL Corp, on his own, threatening that he was unlikely to get anywhere without the Dealerships assistance.

127.    With that, Mr. Estrada then told Shehad that the Dealership would not do anything else to assist Ms. Chowdhury with the situation.

128.    The next day, Shehad contacted the Service Contract provider, AUL, and asked a representative for assistance cancelling the "warranty" or service contract.

129.    Shehad explained to the AUL representative that they had never been provided with a copy of any document related to the service contract, but that he had been told by the Dealership to contact AUL to cancel the service contract.

130.    AUL identified an account for Ms. Chowdhury and emailed Shehad a copy of a service contract that was purportedly agreed to by Ms. Chowdhury.

131.    On November 12, 2013, AUL emailed Shehad a copy of the service contract purportedly signed by Ms. Chowdhury.

132.    It showed that the cost of the contract was Upon reviewing the contract Plaintiff and Shehad discovered that the price of the contract was listed as $2,315, the price of the vehicle was listed as $19,476, the contract purchase date was listed as January 30, 2013, and that the selling dealership was Planet Motor Cars, Inc. at 160-14 Hillside Avenue, Jamaica, NY.

133.    The Service Contract also listed the mileage of the Vehicle incorrectly as 20,150 miles, in reality the mileage on the Vehicle at the time of purchase was 57,444 as disclosed in the transaction documents provided to Ms. Chowdhury.

134.    Most significantly, the contract, which had never been shown to or signed by Ms. Chowdhury, contained a forged signature of her name over the "Owner's Signature" line.

135.    Ms. Chowdhury's signature was forged on to the service contract, on information and belief, by someone at the Dealership.

136.   Shehad called back to AUL on November 12, 2013 and explained all of these problems with the Service Contract and requested cancellation and full refund of any amounts charged for the contract.

137.   A representative for AUL first responded that the Service Contract had expired, as the mileage of the vehicle, confirmed by Shehad, had now increased by over 30,000 miles from what was disclosed on the service contract.

138.   Shehad then provided AUL with proof of the mileage as accurately disclosed at the time of sale.

139.   Again Shehad requested cancellation and full refund of all sums charged for the contract.

140.   AUL was only willing to refund 45% of the $2315 purchase price for the contract.

141.   Although Shehad explained that the document had never been shown to his mother, and appeared to be prepared and sent to AUL by someone at the Dealership after Ms. Chowdhury had purchased the vehicle, AUL refused to provide anything more than a partial refund and directed Shehad to speak with the Dealership about the rest of the money.

142.   AUL has since sent the 45% refund (minus a $100 cancellation fee) to M&T Bank which has applied the amount to Ms. Chowdhury's loan obligation.

143.   At all relevant times Defendants acted willfully and in bad faith.

144.   The unlawful actions described herein harmed Plaintiff.

### COUNT I
### CIVIL VIOLATIONS OF RICO, 18 U.S.C. § 1692(c) & (d)
### (Against New York Motor Group, Planet Motor Cars and M&T only)

145.   Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

146.   Plaintiff is a natural person, and as such is a "person" within the meaning of 18 U.S.C. § 1961(3).

147.    Defendants are legal entities capable of holding beneficial interests in property, and as such are "persons" within the meaning of 18 USC § 1961(3).

148.    New York Motor Group, Planet Motor Cars and M&T (collectively "the Enterprise Defendants") comprise distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4).  Each and every one of these defendants is associated with the enterprise, and have participated in the conduct and operation of the Enterprise.

149.    On information and belief these entities taken together are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

150.    The enterprise defendants have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics.  The acts in furtherance of the enterprise, as described below, are not isolated events.

151.    The purpose of the enterprise is to place consumers into auto loans that obligate the consumers to larger payments than advertised or promised in order to profit the Dealerships and M&T through the assignment of loans that were obtained through fraudulent means, including but not limited to false representations, forgery, and the false and deceptive inflation of advertised prices.  The relationships between the Enterprise Defendants are longstanding and ongoing.

152.    All Defendants used wire and telecommunications in interstate commerce in furtherance of their enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1692(c), to wit: multiple violations of 18 U.S.C. § 1343.

153.    The Enterprise has been ongoing for at least one year and engaged in and continues to engage in activities that affect interstate commerce, including but not limited to, the sale and financing of motor vehicles often obtained through auction or other means in and carted from

states outside New York for resale in New York, and for resale to residents of states other than New York.

154. The Enterprise, in violation of RICO, has been and remains longstanding, continuous and open ended, to wit: the enterprise defendants are all still operating and their scheme carries the threat of continued criminal activity and harm; moreover the enterprise and the fraudulent and predatory scheme executed by the Enterprise has obligated or purported to obligate consumers, including plaintiff, to long term loan obligations far in excess of the obligations that were promised, causing the financial harm of this scheme to reach into the future for at least the next several years.

155. The Enterprise Defendants, individually and collectively, as an Enterprise, have devised or intended to devise a scheme to defraud, or for obtaining money and property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of wire or mail for the purpose of executing the scheme in violation of 18 USC §§ 1341 and 1343 on multiple occasions, as is described below.

156. The multiple violation of 18 USC §§ 1341 and 1343 constitute racketeering activity pursuant to 18 USC § 1961 and were an integral part and essential to the success of the predatory and fraudulent scheme.

157. Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations using wire and telecommunications. The scheme includes but is not limited to:

      a. Advertising sale prices for vehicles on the internet and elsewhere that appear to be discounted and in some instances deeply discounted for thousands of dollars under market value in an effort to lure more consumers to the Dealership

b.  Preparing Retail Installment Contracts for the sale of motor vehicles that inflate the price of the vehicles beyond those that are advertised by falsely telling consumers that they are required to purchase additional products such as service contracts, warranties, and insurance policies in order to obtain financing through M&T;

c.  Obtaining payments from or on behalf of consumers for promised insurance policies that are not real or are not created for the consumers as promised;

d.  Preparing service contracts and theft deterrent product protection forms in order to induce payments from or on behalf of consumers when in fact, no service contract or product protection policy is actually put in place for the consumer;

e.  Inducing consumers to enter loan obligations with higher than necessary payments, higher than advertised prices, and the inclusion of unnecessary and/or non-existent additional products with the false promise that consumers may return to the Dealership within 4-8 months to refinance the loans and receive significantly reduced interest and monthly payment obligations;

f.  Obtain payments from consumers by promising to arrange refinancing with banks or credit unions on more favorable terms without having any intention and without making any effort to actually arrange the refinancing;

g.  Obtain payments from consumers by falsely promising that the payments will serve to pay-off loan balances or to pay for the price of the vehicle in-full, when in reality loan obligations holding consumers to the higher than advertised or agreed to prices are left in effect leaving the consumer obligated to M&T despite having paid for the vehicle in full;

    h.   Creating service contracts and other product forms through the use of identity theft and the preparation of forged documents that were never shown to or signed by the consumer who is purportedly obligated to terms of the contracts and the payments thereunder;

    i.   The collection of money on these illegal debts

158.    The Enterprise Defendants, acting individually and as part of the Enterprise have made fraudulent misrepresentations on specific occasions as follows:

    a.   On December 27, 2012, January 29, 2014, Defendants conveyed to consumers Simon Gabrys and Plaintiff respectively, that they were required to purchase service contracts and or insurance policies in order to obtain financing through M&T when that was not true and in fact, they are prohibited from requiring the purchase of additional products beyond the subject vehicle when arranging financing.

    b.   On December 27, 2012 Defendants obtained payments from Simon Gabrys and induced him into a loan obligation with M&T with the false promise that the consumer could return to the Dealership in 4-8 months to refinance the loan on more favorable terms.

    c.   On January 29, 2013, the Dealership on behalf of the Enterprise induced Plaintiff into a loan obligation to M&T with the false promise that she could pay-off the loan in full after 6 monthly payments with a final lump sum payment to the dealership.

    d.   On June 21, 2013, the Dealership, on behalf of the Enterprise, induced related-Plaintiff Shahadat Tuhin into a loan obligations to M&T bank with the false

promise that the interest rate of 5.84% would drop to 2.17% and thereby decrease the monthly payments due for the remaining 54 months, if he made the first six monthly payments on time.

    e. On August 21, 2013,the Dealership, on behalf of the Enterprise, obtained a payment of $4,480.81 from Shehad Kazi on behalf of Plaintiff with the false promise that her M&T-assigned loan would be paid-off in full by the payment, when that was not true.

159. Enterprise Defendants acting individually and as part of the Enterprise, have used the wires and have caused the wires to be used, or reasonably knew the wires would be used, in furtherance of their fraudulent scheme.  Specifically:

    a) On several dates, including but not limited to, dates in December 2012, January 2013, June 2013, and July 2013 the Dealership used the internet to advertise prices for vehicles on websites including cars.com; autotrader.com, and newyorkmotorgroup.com that listed prices that appeared discounted, in some instances deeply so, but in actuality were only listed to lure consumers to the dealership in order to then place them in loan obligations with drastically increased vehicle prices.

    b) On or about December 27, 2012, for the purpose of assigning a fraudulent loan obligation, the Dealership transmitted by wire to M&T fraudulently prepared documents, including but not limited to a Retail Installment Contract signed by Simon Garbys and the Dealership that was induced through the false promise that the interest rate of 5.74% could be refinanced for a lower interest in 6 months;

c) On or about December 27, 2012, or soon thereafter, M&T transmitted by wire, its acceptance of the assignment of this fraudulently induced loan obligation and on or about that date, or shortly thereafter, transferred money to the Dealership to fund the loan.

d) On or about January 29, 2013, for the purpose of assigning a fraudulent loan obligation, the dealership transmitted by wire to M&T fraudulently prepared documents, including but not limited to a Retail Installment Contract signed by Plaintiff and the Dealership that was induced through the false promise that the loan could be paid off in-ful with 6 monthly payments and a final payment to the Dealership of $4,000.

e) On January 29, 2013, or shortly thereafter, M&T transmitted by wire, its acceptance of the assignment of this fraudulently induced loan obligation and on or about that date, or shortly thereafter, transferred money to the Dealership to fund the loan.

f) On or about June 23, 2013, for the purpose of assigning a fraudulent loan obligation, the dealership transmitted by wire to M&T fraudulently prepared documents, including but not limited to a Retail Installment Contract signed by Shahadat Tuhin and the Dealership that was induced through the false promise that the interest rate of 5.84% would drop to 2.17% and thereby decrease the monthly payments due for the remaining 54 months, if he made the first six monthly payments on time.

g) On June 23, 2013 or shortly thereafter, M&T transmitted by wire its acceptance of the assignment of this criminally produced loan obligation and on or about that date, or shortly thereafter, transferred money to the Dealership to fund the loan.

h) On June 24, 2013, M&T used an interstate telephone call to falsely convey to Shahadat Tuhin that in the event that the Dealership had fraudulently created a loan obligation assigned to M&T, there was nothing M&T could do about that and that Mr. Tuhin would have to contact the attorney general.

i) In October and November 2013 M&T used interstate telephone call to falsely convey to Plaintiff's son that it was conducting an investigation of the Dealership in order to assist Plaintiff with her dispute that the Dealership fraudulently induced her into the larger than promised loan obligation, when M&T had no intention of conducting a meaningful investigation or had no intention of altering its demands for full payment of all monies required on the face of loan, regardless of its findings.  In furtherance of the Enterprise and for the benefit of all Enterprise Defendants, M&T falsely advised Plaintiff's son over the phone that there was nothing more M&T could do to alter the terms of the loan or its own demands for full payment.

j) M&T has repeatedly demanded full payments from Plaintiff on the loan obligation despite knowing or despite the fact that it should know that the loan obligation was the result of fraud by using the U.S. mail to send billing statements to Plaintiff and other consumers, every month since at least March 2013 to the present.  And, if left unchecked, M&T will almost certainly continue to use the

24

mails in this way to demand and receive payments from Plaintiff and other consumers on these illegal debts.

160. On information and belief, the Enterprise Defendants repeated these wire and mail transmissions for the purpose of assigning and collecting on other fraudulently induced loan obligations on several other occasions for the entire course of their dealings.

161. M&T continues to rely on the wire and mail transmissions described above to assert the same false statements to other consumers regarding its right to payments on fraudulently induced loans despite the fact that it does not have a good faith basis for asserting its demand.

162. Defendants have used the wires and/or mails in connection with every fraudulently induced retail installment contract they have obtained, and each use of the wires has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiff and other consumers by means of false pretenses and representations.

163. On information and belief, each and every defendant has specific knowledge that the wires and mail are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the wires and mail would be used because the agreement to assign loans between the Defendants relies on faxes and electronic communications in order to transmit documents and obtain payments. Indeed, the Enterprise relies on the electronic communication system of DealerTrack, Inc. in order to have quick communication between the Dealer and M&T to assign and receive payments on the fraudulently created loans. Moreover, the Defendants are all aware that M&T will use telephone and mail communications to demand payments on the loans once they are assigned.

164.  All Defendants are aware that M&T will use the mail to demand payments and will use collection actions including legal process and self-help repossession in order to take vehicles from consumers who refuse to or can no longer afford to pay under the burdensome and illegal terms of the fraudulent loans.

165.  Each of the uses of the wires and mails in connection with Defendants' schemes to defraud constitutes a separate instance of wire or mail fraud within the meaning of 18 U.S.C. § 1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

166.  In connection with Defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.,* and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of all Enterprise Defendants' regular way of doing business. The predicate acts have been and will be repeated.

167.  As described here, the goal of the Enterprise is to obtain larger payments from or on behalf of consumers through the use of fraudulent means such as false promises of refinancing or pay-off, the "requirement" of unnecessary or bogus products, or identity theft in order to induce consumers, to commit to higher than promised loan obligations.

168.  The pattern of racketeering activity described above is integral to the Enterprise Defendants' scheme.  Without engaging in wire and mail fraud or theft, Defendants would be unable to obtain the larger payments or other property they seek.

169. Each Enterprise Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs

through the pattern of racketeering activity described above.  Accordingly, each defendant has violated 18 U.S.C. § 1962(c).

170.  Moreover, each Enterprise Defendant, has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts described above, and has thus violated 18 U.S.C. § 1962(d).

171.  Moreover, M&T's participation and agreement to fund the loans assigned to it by the Dealership is an integral part of the RICO Enterprise.  But for M&T use of the wires to accept assignment and commit to funding the fraudulently induced loans, the Enterprise would not exist.

172.  But for M&T's use of the wires and mail to demand payment and falsely assert its inability to assist consumers with the fraudulent loans, the Enterprise would not exist, as all Defendants know that M&T will falsely assert its rights to full payments on all loans assigned regardless of the fraudulent activity involved in the origination of the loan.

173.  As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff and other consumers have suffered substantial injuries. Plaintiff has had money extracted from her, been obligated to a larger financial burden than originally promised, thus constituting an injury to Plaintiff's property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1 962(c) & (d).

174.  Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced over a year ago and has continued to the present. The pattern of racketeering activity has, on information and belief, been directed towards hundreds, if not thousands, of consumers, including Plaintiff.  Due to the long term nature

of the fraudulent loan obligations created by and assigned within the Enterprise, the effects

of the Defendants activities will reach into the future for at least the next several years.

175.  For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiff is entitled to

recover compensatory and treble damages in an amount to be determined at trial,

reasonable costs and attorneys fees, and to a prospective order directing Defendants to

disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in

the future.

**COUNT II**
**CIVIL VIOLATIONS OF RICO, 18 U.S.C. § 1692(c) & (d)**
**(Against Mamdoh Eltouby, Nada Eltouby, and Julio Estrada)**

176.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

177.    Plaintiff is a natural person, and as such is a "person" within the meaning of 18 U.S.C. §

1961(3).

178.    Defendants are natural persons and as such are "persons" within the meaning of 18 USC

§ 1961(3).

179.    On information and belief, Mamdoh Eltouby, Nada Eltouby, Julio Estrada (collectively

"the Enterprise Defendants"), and other unnamed and as yet unknown individuals comprise

distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. §

1961(4).  Each and every one of these defendants is employed by or associated with the

enterprise.

180.    The Enterprise is comprised of the auto dealerships owned and operated by Mamdoh

Eltouby which include New York Motor Group, Planet Motor Cars, and Hillside Motors,

LLC.  These legal entities comprise an enterprise as defined under 18 U.S.C. § 1961(4).

(The Dealerships shall be referred to hereafter as "Dealership" or "Enterprise")

181.  Mr. Eltouby has at all times described herein, directly participated in the activity described in furtherance of the Enterprise or has directed or knowingly allowed the other Enterprise Defendants and other employees and agents under his control and supervision to conduct the affairs of the Enterprise in the improper and illegal manner described for the benefit of all Defendants.

182.  The Enterprise Defendants have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics.  The acts in furtherance of the enterprise, as described below, are not isolated events.

183.  The Enterprise Defendants conspired together to operate the Enterprise in an impermissible manner: placing consumers into excessively expensive car loans by using false promises, fraud, forgery, and identity theft or employing others to use these tactics, in order to inflate advertised prices and place consumers in larger debt obligations than promised, which are then assigned by use of the wires to financial institutions.

184.  The relationships between the Enterprise Defendant are longstanding and ongoing.

185.  All Defendants used, or operated and controlled the Enterprise and its employees and agents to use, wire and telecommunications in interstate commerce in furtherance of their enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1692(c), to wit: multiple violations of 18 U.S.C. § 1343.

186.  The Enterprise has been ongoing for at least two years and engaged in and continues to engage in activities that affect interstate commerce, including but not limited to, the sale and financing of motor vehicles often obtained through auction or other means in and carted from

states outside New York and the assignment of fraudulently induced and created loans

between entities in New York and other lending institutions that reside outside of New York.

187.    The Enterprise in violation of RICO has been and remains longstanding, continuous and

open ended, to wit: Enterprise Defendants, on information and belief, are still running or

operating the Enterprise activities under the name Hillside Motors, LLC. And their scheme

carries the threat of continued criminal and fraudulent activity and harm; moreover the

enterprise and the fraudulent and predatory scheme executed by the Enterprise has obligated

consumers, including plaintiff, to long term loan obligations far in excess of the obligations

that were promised, causing the financial harm of this scheme to reach into the future for at

least the next several years.

188.    The Enterprise Defendants, individually and collectively, as an Enterprise, have devised

or intended to devise a scheme to defraud, or for obtaining money and property by means of false

or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by

means of wire or mail for the purpose of executing the scheme in violation of 18 USC § 1343 on

multiple occasions, as is described below.

189.    The multiple violation of 18 USC § 1343 constitute racketeering activity pursuant to 18

USC § 1961 and were an integral part and essential to the success of the predatory and fraudulent

scheme.

190.    The Enterprise Defendants, individually and collectively, as an Enterprise, have engaged

directly or indirectly, in a pattern of racketeering activity, as described below, in violation of

18 U.S.C. § 1962(c) & (d).

191.    Defendants, acting individually and as part of the Enterprise, have devised a scheme to

defraud and to obtain money or property by means of false or fraudulent pretenses and

representations. The scheme includes but is not limited to:

    a.  Advertising sale prices for vehicles on the internet and elsewhere that appear to be
discounted and in some instances deeply discounted for thousands of dollars
under market value in an effort to lure more consumers to the Dealership

    b.  Preparing Retail Installment Contracts for the sale of motor vehicles that inflate
the price of the vehicles beyond those that are advertised by falsely telling
consumers that they are required to purchase additional products such as service
contracts, warranties, and insurance policies in order to obtain financing;

    c.  Obtaining payments from or on behalf of consumers for promised insurance
policies that are not real or are not created for the consumers as promised;

    d.  Preparing service contracts and theft deterrent product protection forms in order
to induce payments from or on behalf of consumers when in fact, no service
contract or product protection policy is actually put in place for the consumer;

    e.  Inducing consumers to enter into loan obligations with higher than necessary
payments, higher than advertised prices, and the inclusion of unnecessary and/or
non-existent additional products with the false promise that consumers may return
to the Dealership within 4-8 months to refinance the loans and receive
significantly reduced interest and monthly payment obligations;

    f.  Obtain payments from consumers by promising to arrange refinancing with banks
or credit unions on more favorable terms without having any intention and
without making any effort to actually arrange the refinancing;

g.   Obtain payments from consumers by falsely promising that the payments will serve to pay-off loan balances or to pay for the price of the vehicle in-full, when in reality loan obligations holding consumers to the higher than advertised or agreed to prices are left in effect leaving the consumer obligated to banks despite having paid for the vehicle in full;

h.   Creating loan obligations that are assigned to lending institutions through the use of identity theft and the preparation of RIC's and other documents that were never shown to or signed by the consumer who is purportedly obligated on the loan.

192.   The Enterprise Defendants, acting individually and as part of the Enterprise have made fraudulent misrepresentations on specific occasions as follows:

a.   On December 20, 2012, December 27, 2012, January 14, 2013, January 29, 2013, February 19, 2013, April 15, 2013, and October 26, 2013 Enterprise Defendants, or other agents and employees on behalf of the Enterprise, conveyed to consumers Anwar Alkhatib, Simon Gabrys, Dilshod Zaripov, Plaintiff, Boris Freire, Zhenghui Dong, and Gagan Bains, respectively, that they were required to purchase service contracts, insurance policies, and/or other products or incur other charges and fees in order to obtain financing through the Dealerships assignee when that was not true and in fact, they are prohibited from requiring the purchase of additional products beyond the subject vehicle when arranging financing.

b.   On December 27, 2012, January 14, 2013 and February 19, 2013 Enterprise Defendants obtained payments from consumers with the false promise that the consumer could return to the Dealership in 4-8 months to refinance their loans at more favorable terms.

c.  On December 27, 2012, January 3, 2013, February 19, 2013, July 17, 2013 and August 16, 2013 Enterprise Defendant Julio Estrada on behalf of the Enterprise promised to arrange to refinance consumers loans with Bank of America and/or People's Credit Union and/or other financial institutions, when it was not possible or when Defendants had no intention of doing so.

d.  On April 15, 2013 and July 30, 2013 Enterprise Defendants or other agents and employees, on behalf of the Enterprise, obtained payments totaling $13,500 from Plaintiff Zhenghui Dong through the false promise that such payment would pay-off the car in full and leave her with the title to the car free and clear of any lienholder.

e.  On June 24, 2013 Enterprise Defendants Nada Eltouby and Julio Estrada, on behalf of the Enterprise, falsely promised related-Plaintiff Shahadat Tuhin that the terms of Mr. Tuhin's loan obligation to M&T Bank will improve after 6 months providing him with a significantly reduced interest rate and monthly payment obligation.

f.  On August 16, 2013, Defendants, on behalf of the Enterprise, obtained a payment of $3,000 from Boris Freire and Miriam Osorio with the false promise that their Santander-assigned loan would be refinanced with Bank of America when it was not possible or when Defendants had no intention of doing so.

g.  On August 21, 2013, Defendant Julio Estrada, on behalf of the Enterprise, obtained payment of $4480.81 from Plaintiff's son on Plaintiff's behalf, with the false promise that the payment would serve to pay-off the balance of Plaintiff's

loan obligation to M&T Bank and leave her with title to the vehicle free and clear of that entity's lien.

h.  On August 21, 2013, the Defendant Julio Estrada, on behalf of the Enterprise, obtained payment of $8,490.00 from Dilshod Zaripov through the false promise that such payment would pay-off that consumer's obligation to Santander Consumer USA, Inc. and leave him with the title to his vehicle free and clear of that entity's lien.

193.  Enterprise Defendants acting individually and as part of the Enterprise, have used the wires and have caused the wires to be used, or reasonably knew the wires would be used by their agents or employees, in furtherance of their fraudulent scheme.  Specifically:

a)  On some date in December 2012 (the specific date being unknown to Plaintiff, but easily identified through the records of the Enterprise Defendants or the Enterprise), on information and belief, Defendants transmitted by wire to Santander Consumer USA, Inc., fraudulently prepared documents, including but not limited to a Retail Installment Contract signed by consumer Robert Muniz and the Dealership that was induced through the false promise that the sub-prime interest rate could be refinanced for a lower rate in 6 months;

b)  On or about December 27, 2012, for the purpose of assigning a fraudulent loan obligation, the Enterprise Defendants transmitted by wire to M&T fraudulently prepared documents, including but not limited to a Retail Installment Contract signed by Simon Garbys and the Dealership that was induced through the false promise that the interest rate of 5.74% could be refinanced for a lower interest in 6 months;

c)   On or about January 14, 2013, for the purpose of assigning a fraudulent loan
     obligation, the Enterprise Defendants transmitted by wire to Santander Consumer
     USA, Inc. fraudulently prepared documents, including but not limited to a Retail
     Installment Contract signed by Dilshod Zaripov and the Dealership that was
     induced through the false promise that the sub-prime interest rate of 24.99% could
     be refinanced for a lower interest in 6 months;

d)   On or about January 29, 2013, for the purpose of assigning a fraudulent loan
     obligation, the Enterprise Defendants transmitted by wire to M&T fraudulently
     prepared documents, including but not limited to a Retail Installment Contract
     signed by Plaintiff and the Dealership that was induced through the false promise
     that the loan could be paid-off in-full with 6 monthly payments and a final
     payment to the Dealership of $4,000 .

e)   On a date between January 29, 2013 and March 1, 2013 (the exact date not being
     known to Plaintiff but easily identified from the records of the Enterprise and/or
     other business with which the Enterprise transacted) Enterprise Defendants forged
     Plaintiff's signature to a Service Contract she had never been shown and
     transmitted it by wire to A.U.L. Corp, in furtherance of the Enterprise's scheme
     and financial goals.

f)   On February 19, 2013, for the purpose of assigning a fraudulent loan obligation,
     Enterprise Defendants transmitted by wire to Santander fraudulently prepared
     documents, including but not limited to a Retail Installment Contract signed by
     Boris Freire and the Dealership that was induced through the false promise that

the sub-prime interest rate of 20.74% could be refinanced for lower interest and lower monthly payments within 6 months,

g) On or about June 23, 2013, for the purpose of assigning a fraudulent loan obligation, the Enterprise Defendants transmitted by wire to M&T fraudulently prepared documents, including but not limited to a Retail Installment Contract signed by Shahadat Tuhin and the Dealership that was induced through the false promise that the interest rate of 5.84% would drop to 2.17% and thereby decrease the monthly payments due for the remaining 54 months, if he made the first six monthly payments on time.

h) At some time between July 30, 2013 and December 4, 2013 (the specific date being unknown to Plaintiff, but easily identified through the records of the Enterprise Defendants) Enterprise Defendants, for purposes of assigning a fraudulent loan obligation, transmitted by wire to Santander Consumer USA, Inc. documents prepared through identity theft, including but not limited to, a Retail Installment Contract created by the Dealership through the use of forgery, purportedly obligating consumer Zhenghui Dong to a loan obligation of over $30,000 after Ms. Dong had already paid for a vehicle in-full.

i) On several dates in October 2013, including but not limited to October 21, 2013 October 25, 2013 Defendant Julio Estrada, on behalf of the Enterprise, used SMS/Text messaging to communicate with Boris Freire and Shehad Kazi to assure them, for the benefit of the Enterprise, that the he would take care of the late payments being demanded from Santander and M&T, respectively, after the Dealership had obtained money from each of them on the false pretense that the

additional payments would either go towards refinancing or pay-off of loan balances.

194.　Defendants have used the wires in connection with every fraudulently induced retail installment contract they have obtained, and each use of the wires has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiff and other consumers by means of false pretenses and representations.

195.　On information and belief, each and every defendant has specific knowledge that the wires are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the wires would be used because the Dealerships' business model relies on faxes and electronic communications with financial institution assignees and others in order to obtain payments.  Indeed, the dealership relies on the electronic communication system of DealerTrack, Inc. in order to have quick communication with financial institutions in order to assign and receive payments on the loans it creates.

196.　Each of the uses of the wires in connection with Defendants' scheme to defraud consumers constitutes a separate instance of wire fraud within the meaning of 18 U.S.C. § 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

197.　In connection with Defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.,* and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated.

198.   As described here, the goal of the Enterprise is to obtain larger payments from or on behalf of consumers through the use of fraudulent and criminal means such as false promises of refinancing, the "requirement" of unnecessary or bogus products, or identity theft in order to induce consumers, who can little afford it, to commit to excessively high, and often sub-prime, loan obligations, or to commit consumers to such obligations without the consumer's knowledge or consent.

199.   The pattern of racketeering activity described above is integral to the Enterprise Defendants' scheme.  Without engaging in wire fraud, Defendants would be unable to obtain the larger payments they seek.

200.   Each Enterprise Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above.  Accordingly, each defendant has violated 18 U.S.C. § 1962(c).

201.   Moreover, each Enterprise Defendant, has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts of wire fraud described above, and has thus violated 18 U.S.C. § 1962(d).

202.   As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff and other consumers have suffered substantial injuries. Plaintiff has had money taken from her, been obligated to a larger financial burden than originally promised and/or is legally possible, all as a direct and proximate result of the RICO violations described here, thus constituting an injury to Plaintiff's property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1 962(c) & (d).

203.    Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced over a year ago and has continued to the present. The pattern of racketeering activity has been directed towards hundreds, if not thousands, of consumers, including Plaintiff. Due to the long term nature of the fraudulent loan obligations created by and assigned within the Enterprise, the effects of the Defendants activities will reach into the future for at least the next several years.

204.    For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiff is entitled to recover compensatory and treble damages in an amount to be determined at trial, reasonable costs and attorneys fees and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

## COUNT III
## VIOLATIONS OF NEW YORK MOTOR VEHICLE
## RETAIL INSTALLMENT SALES ACT § 302, et seq. (MVRISA)

205.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

206.    The Plaintiff is a "retail buyer" within the meaning of MVRISA § 301(2).

207.    The Dealership is a "retailer seller" within the meaning of MVRISA § 301(3).

208.    The transaction as described above was a "retail instalment sale" within the meaning of MVRISA § 301(4).

209.    Under MVRISA § 302(1) a motor vehicle retail installment contract shall contain all of the agreements between the parties.

210.    The RIC here did not contain all of the agreements between the parties. To wit: the Dealership promised that Plaintiff would be able to pay-off the loan in 6 months with a final lump sum payment to the Dealership, none of those terms are reflected on the face of the RIC, though they were confirmed repeatedly by the Dealership.

211.    Accordingly the Dealerships violated MVRISA § 302(1) by providing a retail installment contract that did not contain all of the terms of the agreement.

212.    Also, under MVRISA § 302(5) the RIC must comply with all disclosure requirements under the Federal Truth in Lending Act (TILA).

213.    The RIC constitutes a consumer credit transaction within the meaning of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

214.    Defendants are creditors within the meaning of TILA and Regulation Z.

215.    The increase in the cash price of the vehicle from the originally confirmed price of $13,500 is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

216.    The cash price increase of over $10,000 is attributable to items and charges that were incurred incident to the extension of credit, and is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

217.    As a result of Defendants' failure to properly include these and/or other fees and charges as finance charges, the sale price, finance charge, amount financed, and APR disclosed in the RIC are all materially misstated, in violation of TILA and Regulation Z. e.g. § 1638(a)(2) through (5) and §226.18(b), (d), (e), and (h).

218.    In addition, Because Plaintiff was specifically told to disregard the amounts listed on the RIC including but not limited to the amount financed, and to abide by the Dealerships oral agreement to pay off Plaintiff's loan after 6 payments.

219.    Accordingly, for all of these reasons, Defendants have failed to provide Plaintiff with clear and conspicuous disclosures of the terms of the loan as required under TILA and

Regulation Z.  e.g. 15 U.S.C. § 1632(a), § 1638(a), and Regulation Z, e.g. 12 C.F.R. § 226.17(a)(1).

220.    As described above the RIC does not comply with TILA and thus also violates MVRISA for failing to properly disclose finance charges.

221.    For all of the reasons stated herein, under MVRISA § 307, Defendants are barred from recovering any credit service charge, delinquency, or collection charge on the RIC.

**COUNT IV**
**VIOLATION OF NEW YORK CIVIL USURY LAWS**

222.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

223.    Pursuant to General Obligations Law § 5-501, the legal rate of interest in New York is "six per centum per annum unless a different rate is prescribed in §14-a of the Banking Law." Section 14-a (1) provides: "The maximum rate of interest provided for in section 5-501 of the general obligations law shall be sixteen per centum per annum."

224.    The Dealership is not a "national banking association," and therefore is not exempt from state usury laws under 12 U.S.C. §85.

225.    The Dealership has obscured the actual rate of interest charged and the total amount financed by hiding additional interest as costs within the purchase.

226.    In reality, the increase in the cash price of the vehicle showing on the RIC and/or the cost of the additional mandatory products and charges are finance charges that should have been disclosed as such in the contract.

227.    When these charges are added to the incomplete finance charge, the total finance charge is actually approximately more than $10,000 higher than reported, and the interest rate for this loan is well over 16%.

228.    Pursuant to NYGOL § 5-501, the alleged interest is therefore usurious, and the creditor forfeits both principal and interest due on the transaction.

229.    As a result of Defendants' violations, Plaintiff is entitled to a declaratory judgment that her obligation to M&T, the assignee of the loan made by the Dealership, is void, and are entitled to damages in the amount of all principal, interest, fees and other charges paid on the auto loan to date.

## COUNT V
## FRAUD

230.    Plaintiff re-alleges and incorporates by reference the foregoing paragraphs.

231.    Defendants intentionally and fraudulently induced Plaintiff to enter into a retail installment contract that increased the sale price of the vehicle by and required Plaintiff to borrow more than $10,000 than was originally agreed and confirmed with the false representation that total loan balance could be paid off after six monthly payments with a final seventh lump sum payment of $4000 (the amount demanded by the dealership was later changed to $4480.81).

232.    Plaintiff justifiably relied upon each of Defendants' misrepresentations of material facts, as a result of which they sustained losses and damages, including an increased debt obligation to M&T Bank.

233.    Had Plaintiff not been misled by Defendants, she never would have agreed to a vehicle purchase transaction obligating her to pay off a vehicle purchase cost that is more than $10,000 higher than had been previously confirmed.

234.    As part of the scheme Defendant required Plaintiff to purchase the vehicle with financing, offering her a significantly reduced purchase price, and then once she had agreed to the purchase with financing, further and falsely told Plaintiff that she could only purchase and finance through

the Dealership if Plaintiff purchased additional products required by the lender, including a service contract.

235.    Defendants further and falsely represented that the Service Contract would be cancelled within 60 days of the vehicle purchase.

236.    Plaintiff justifiably relied upon each of Defendants' misrepresentations of material facts described above, as a result of which she has sustained losses and damages, including but not limited to the loss of money and having been obligated to higher loan payments than originally promised and confirmed by the Dealership.

237.    As a result of Plaintiff's reasonable reliance upon Defendants' misrepresentations, Plaintiff has been damaged in an amount to be determined at trial and is entitled to actual and punitive damages, attorneys fees, and costs and expenses.

## COUNT VI
### NYGBL § 349 (Deceptive Acts and Practices Unlawful)
(Related to the Pay-off/Refinancing Scams)

238.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

239.    Defendants acts and practices set forth above, also constitute violations of NYGBL § 349, which makes deceptive acts in the conduct of business, trade, commerce or the furnishing of a service in this state, unlawful, independent of whether these acts and practices constitute violations of any other law.

240.    These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

241.    Each of these actions was consumer oriented and involves misleading conduct that is recurring and has a broad impact upon the public, or, in the alternative, such misleading practices

are the types that could easily recur, could potentially impact similarly situated consumers, and are therefore consumer-oriented and harmful to the public at large.

242.     Specifically, upon information and belief, Defendants routinely induce customers into more expensive credit obligations with the false promise that the consumer will be able to return to the Dealership to pay-off the loan obligation in a shorter period of time with a minimal lump sum payment to the Dealership or refinance the obligation and receive significantly reduced monthly payments following the payment of the first few monthly payments.

243.     As occurred in Plaintiff's case, when consumers return to the dealership, the Dealership routinely takes additional sums of money from the consumer under the pretense of paying off or refinancing the loan obligation, and then takes no steps to pay-off or refinance.

244.     Upon information and belief, these false and deceptive consumer oriented actions result in all Defendants receiving payments from the transaction that are higher than if the false and deceptive actions were not employed.

245.     Defendants' conduct and statements were materially misleading.

246.     As a result of these violations of NYGBL §349, Plaintiff suffered pecuniary and non-pecuniary harm.

247.     Upon information and belief, Defendants' violations were willful and knowing and committed in bad faith.

248.     For these reasons, Plaintiff is entitled to actual damages, three times the actual damages up to $1000, costs and reasonable attorneys fees pursuant to NYGBL § 349(h), and declaratory judgment that Defendants' practices are deceptive as defined under § 349.

**COUNT VII**
**NYGBL § 349 (Deceptive Acts and Practices Unlawful)**
(Related to Forcing Plaintiff and other Consumers to Purchase Service Contracts, Insurance and other Products)

249.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

250.     Defendants acts and practices set forth above, also constitute violations of NYGBL §
349, which makes deceptive acts in the conduct of business, trade, commerce or the furnishing of
a service in this state, unlawful, independent of whether these acts and practices constitute
violations of any other law.

251.     These deceptive acts and practices were committed in conduct of business, trade,
commerce or the furnishing of a service in this state.

252.     Each of these actions was consumer oriented and involves misleading conduct that is
recurring and has a broad impact upon the public, or, in the alternative, such misleading practices
are the types that could easily recur, could potentially impact similarly situated consumers, and
are therefore consumer-oriented and harmful to the public at large.

253.     Upon information and belief, the Dealership routinely induces customers to purchase
warranties and service contracts and insurance products by falsely representing that such
purchases are required by the banks and finance companies to which the subject loans will be
assigned or are otherwise required to finance the purchase of the vehicle.

254.     Upon information and belief, these false and deceptive consumer oriented actions result
in all Defendants receiving payments from the transaction that are higher than if the false and
deceptive actions were not employed.

255.     Defendants' conduct and statements were materially misleading.

256.     As a result of these violations of NYGBL §349, Plaintiff suffered pecuniary and non-
pecuniary harm.

257.     Upon information and belief, Defendants' violations were willful and knowing and
committed in bad faith.

258.   For these reasons, Plaintiff is entitled to actual damages, three times the actual damages up to $1000, costs and reasonable attorneys fees pursuant to NYGBL § 349(h), and declaratory judgment that Defendants' practices are deceptive as defined under § 349.

## COUNT VIII
### NYGBL § 349 (Deceptive Acts and Practices Unlawful)
(Against M&T only, related to False and Deceptive Representations
Made to Plaintiff and other Consumers)

259.   Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

260.   Defendant M&T's acts and practices set forth above, also constitute violations of NYGBL § 349, which makes deceptive acts in the conduct of business, trade, commerce or the furnishing of a service in this state, unlawful, independent of whether these acts and practices constitute violations of any other law.

261.   These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

262.   Each of these actions was consumer oriented and involves misleading conduct that is recurring and has a broad impact upon the public, or, in the alternative, such misleading practices are the types that could easily recur, could potentially impact similarly situated consumers, and are therefore consumer-oriented and harmful to the public at large.

263.   M&T routinely insists on its right to full payment under loans assigned to it by the Dealership, despite knowing or despite the fact that it should have known that the loan obligations assigned were originated through fraud and criminal activity.

264.   As part of this policy and practice, M&T routinely, falsely, and deceptively explains to consumers who complain of the Dealership's fraud, that M&T will conduct an investigation of the matter, when it has no intention of conducting the investigation, or has no intention of altering its demands for full payment regardless of what it discovers through its investigation, or

has no intention of conducting an investigation in any meaningful way so as to uncover any facts that would alert M&T that it no longer has a good faith claim to full payment on a RIC that is the subject of a consumer complaint.

265.    As part of this scheme, M&T routinely, falsely and deceptively tells consumers that M&T has conducted an investigation when they have not, or that they have determined that the Consumer signed the contract in question and as a result there is nothing else M&T can, should or will do for the consumer and that as a further result, the consumer is still liable for all amounts owing on the face of the contract in question

266.    These false and deceptive consumer oriented actions result in all Defendants receiving and retaining payments from the fraudulent and criminal transactions at the Dealership that require consumers to pay more than were originally promised.

267.    Defendants' conduct and statements are materially misleading.

268.    As a result of these violations of NYGBL §349, Plaintiff suffered pecuniary and non-pecuniary harm.

269.    Upon information and belief, Defendants' violations were willful and knowing and committed in bad faith.

270.    For these reasons, Plaintiff is entitled to actual damages, three times the actual damages up to $1000, costs and reasonable attorneys fees pursuant to NYGBL § 349(h), and declaratory judgment that Defendants' practices are deceptive as defined under § 349.

**COUNT IX**
**NYGBL § 350 (Unlawful False Advertising)**

271.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

272.    The acts and practices set forth above,  also constitute violations of NYGBL § 350, which makes false advertising unlawful, independent of whether these acts and practices constitute violations of any other law.

273.    This false advertising was committed in the conduct of business, trade, commerce or the furnishing of a service in this state.

274.    Under NYGBL § 350, "false advertising" means "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

275.    Ms. Chowdhury came into the Dealership in response to an advertisement on cars.com that offered to sell an 2009 Nissan Murano for $16,999.99.  The Dealership later agreed that the advertised car could be sold for $15,000.  When it was subsequently revealed that the advertised car was not actually available for sale, the Dealership agreed to sell Ms. Chowdhury a similar vehicle for $13,500.  These on-line advertisements and representations are "advertising," as defined by NYGBL§ 350.

276.    Specifically, Defendants falsely advertised the vehicle's price because they hid the true cost to the consumer of purchasing the Vehicle. Defendants did so by increasing the sales price of the vehicle from the amount advertised by adding "mandatory" products, charges, and service contracts.

277.    Defendants' placing an on-line advertisement listing the sale price for a vehicle as $16,999, when that vehicle was no longer available for sale, followed by a false negotiation in which Defendant represented to Plaintiff that the sale price was in fact $13,500, then followed by insisting that amounts had to be added to the price and certain warranties, service contracts, insurance, or other products and charges had to be added to the purchase for thousands of dollars over and above the stated price in order to obtain financing, taken together, represent the Defendants' false advertising.

278.    Defendants' false advertising was done knowingly and willfully and committed in bad faith.

279.    As a result of Defendants' false advertising in violation of NYGBL § 350, Plaintiff suffered actual damages including but not limited to the cost of the added charges that were not included in the advertised price.

280.    For these reasons, Plaintiff is entitled to injunctive relief (enjoining the false advertising practices described above), actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350-e.

### COUNT X
### RESCISSION/MISTAKE

281.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

282.    As alleged herein (see Count of Fraud, *supra*) Defendants have committed fraudulent acts and made fraudulent representations to Plaintiff.

283.    Based on Defendants fraud and misrepresentations, Plaintiff's executions of the RIC and all other contracts are founded upon material mistake.

284.    As a result of Defendants' fraud and misrepresentations and Plaintiff's resulting material mistake, Plaintiff has sustained damages.

285.    Because Plaintiff has consistently sought to resolve this dispute and receive a refund of all charges that were not accurately and truthfully disclosed, there can be no claim of laches.

286.    Plaintiff is ready, willing and able to restore the parties to the position each occupied prior to the execution of the subject agreements, providing that Defendants return all the money paid by Plaintiff in connection with this transaction and otherwise restore Plaintiff to the status quo ante.

287.    Plaintiff has no remedy at law.

288.    By reason of the foregoing, Plaintiff is entitled to a judgment rescinding and setting aside the Retail Installment Contracts and all service contracts and insurance products, and directing the return to her of all money paid in connection with this transaction.

## COUNT XI
## NEGLIGENT HIRING, RETENTION, TRAINING, AND SUPERVISION

289.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

290.    The Dealership and Defendant Mamdoh Eltouby failed to exercise reasonable care in selecting, instructing and supervising the employees and/or agents it hired to sell motor vehicles and arrange vehicle purchase loans.

291.    The Dealership's and Mr. Eltouby's agents and employees acted willfully, unlawfully and in an intentionally fraudulent manner towards Plaintiff as set forth in herein.

292.    Upon information and belief, at all times Defendants Julio Estrada and Nada Eltouby, as well as other as yet unknown employees and agents, were subject to the Dearelship's and Mr. Eltouby's direct supervision and control.

293.    The Dealership and Mr. Eltouby knew or should have known of the other Defendants',

and other agents and employees, propensity to commit the unlawful acts described herein or should have known of such propensity had they conducted an adequate hiring and supervision procedure.

294.     The Dealership and Mr. Eltouby do not properly train or supervise the employees and/or agents they use to sell vehicles and arrange for vehicle financing.

295.     Indeed, upon information and belief, the Dealership and Mr. Eltouby train their employees and/or agents to violate state and federal consumer and other laws.

296.     The Dealership and Mr. Eltouby owed a duty of care to Plaintiff that its employees and agents would act in accordance with state and federal laws.

297.      As a direct result and proximate cause of the Dealership's and Mr. Eltouby's employees and/or agents' unreasonable, unfair, illegal and fruadulent conduct, Plaintiff has suffered harm including, without limitation, the damages set forth in Counts I-X, above.

298.     As a result of the foregoing, Plaintiff is entitled to actual and punitive damages, and reasonable costs.

WHEREFORE Plaintiff respectfully demands judgment against Defendants as follows:

a.  On COUNT I and II, VIOLATIONS OF RICO, judgment against Defendants for compensatory and treble damages in an amount to be determined at trial, reasonable costs and attorneys fees, and a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future;

b.  On COUNT III, VIOLATIONS OF MVRISA, declaratory judgment against Defendants that they have violated MVRISA and an order barring recovery of any credit service charge, delinquency, or collection charge under the RIC.

c.  On COUNT IV VIOLATIONS OF NEW YORK CIVIL USURY LAWS, declaratory judgment that Plaintiff's obligation to M&T, the assignee of the loan made by Defendants, is void, actual damages in the amount of all principal, interest, fees, and charges paid and such other and further relief as the Court deems appropriate;

d. On COUNT V, FRAUD, judgment against Defendants, actual damages, punitive damages, costs and reasonable attorneys fees;

e. On COUNT VI, COUNT VII, and COUNT VIII NYGBL § 349, judgment against Defendants, injunctive relief, actual damages, three times the actual damage up to $1,000, costs and reasonable attorneys fees pursuant to NYGBL § 349(h), declaratory judgment that Defendants have violated NYGBL § 349 and such other and further relief as the Court deems appropriate;

f. On COUNT IX NYGBL § 350, judgment against Defendants, injunctive relief, actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350(e), declaratory judgment that Defendants' have engaged in false advertising and such other or further relief as the Court deems appropriate;

g. On COUNT X RESCISSION/MISTAKE, judgment rescinding and setting aside the Retail Installment Contract and service contract, and directing the return to Plaintiff of all money paid in connection with this transaction;

h. On Count XI NEGLIGENT HIRING RETENTION AND TRAINING, judgment against Defendants for actual damages, punitive damages and reasonable costs.

i. Such other and further relief as law or equity may provide.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: May 16, 2014
      New York, New York

Respectfully Submitted,

Peter T. Lane, Esq.
Schlanger & Schlanger, LLP
*Attorneys for Plaintiff*
9 East 40th Street, Suite 1300
New York, NY 10016
Ph: 914-946-1981, ext. 109
peter.lane@schlangerlegal.com

52